# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FIRST NATIONAL BANK OF
DANVILLE, as Administrator of
the Estate of ALLEN J. PIERCE,
and MARY PIERCE, Individually
and as Administrator of the
Estate of ALLEN M. PIERCE,**

**Plaintiffs,**

**v.**

**SYSTEM TRANSPORT, INC., a
Washington Corporation; GENIE
INDUSTRIES, INC., a Washington
Corporation; and MARKET
TRANSPORT, LTD. d/b/a MARKET
LOGISTICS, an Oregon
Corporation,**

**Defendants.**

**FILED**

MAY 1 7 2005

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

**Case No. 01 C 9205**

**Hon. Harry D. Leinenweber**

## MEMORANDUM OPINION AND ORDER

Before the Court are the Partial Motions for Summary Judgment of Defendants System Transport, Inc. (hereinafter, "System"), Genie Industries, Inc. (hereinafter, "Genie"), and Market Transport, Ltd. (hereinafter, "Market").

### I. BACKGROUND

This diversity action arises from a tragic auto accident that occurred on September 1, 2001. On that day, System's driver Gregory Maine, was transporting two Z-60 lifts manufactured by Genie on a flatbed tractor-trailer. Maine loaded the lifts at the Genie facility in Moses Lake, Washington and was traveling southbound toward North Carolina on I-65. The Pierce family which

included husband, wife and infant son, was also traveling in their family car on I-65 when they sustained a flat tire outside Hobart, Indiana.  Mr. Pierce pulled over to the shoulder and began fixing the tire with Mrs. Pierce's assistance.  Their son Allen remained in the car.

While Mr. Pierce was fixing the flat tire, Maine lost control of the System trailer after driving through a construction zone lane shift and hitting a dip in the highway.  The trailer fell to its right and the two Genie Z-60 lifts broke loose of their securement chains and straps. One lift hit the Pierce family car, which burst into flames and killed the couple's son, who was trapped inside the car.  Mary Pierce watched the crash and the subsequent death of her son while standing outside the car. Another lift collided with Mr. Pierce and severed his leg, which he lost as a result of the accident.

The Third Amended Complaint seeks compensatory and punitive damages based on theories of negligence, wrongful death, strict liability, and negligent infliction of emotional distress as a result of the collision.

## II.  LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law." FED. R. CIV. P. 56(c). A
genuine issue of triable fact exists only if "the evidence is such
that a reasonable jury could return a verdict for the nonmoving
party." *Pugh v. City of Attica*, 259 F.3d 619, 624 (7th Cir. 2001)
(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106
S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

## III. DISCUSSION

### A. System's Partial Motion for Summary Judgment

System leased the flatbed tractor-trailer involved in the
accident and employed the driver, Gregory Maine. Its partial
summary judgment motion involves Plaintiffs' punitive damages claim
against System. The Court already has concluded that Indiana law
applies to this case. (*See* 4/23/02 Minute Order). System claims
that Indiana law does not support punitive damages under the facts
here.

Under Indiana law, punitive damages will not stand if the
facts demonstrate negligence only (*i.e.*, merely failing to act as
a reasonable person does not constitute the type of conduct
punishable by punitive damages). *See, e.g., Austin v. Disney Tire
Co., Inc.*, 815 F. Supp. 287 (S.D. Ind. 1993). The purpose of
punitive damages is to identify and deter conduct that is driven by
a mental state of obduracy. *Id.* at 288. For conduct to be
punishable by punitive damages, one must look to the actor's
subjective state of mind and determine that the actor recognized

- 3 -

the danger that would probably result in injury, and consciously and intentionally disregarded it. *Id.* at 288-89; *see also Purnick v. C.R. England, Inc.*, 269 F.3d 851, 852 (7th Cir. 2001)(stating that the "punitive damages standard in Indiana . . . presents a high hurdle"). "Punitive damages may be awarded upon a showing of defendants' will and wanton misconduct, even absent malice, ill will, or intent to injury." *Wanke v. Lynn's Trans. Co.*, 836 F. Supp. 587, 599-600 (N.D. Ind. 1993)(citing *Picadilly, Inc. v. Colvin*, 519 N.E.2d 1217, 1221 (Ind. 1988)). Negligent conduct, on the other hand, is judged by a reasonable person objective standard. Punitive damages must be proved by clear and convincing evidence and the analysis is fact-driven. Ind. Code § 34-51-3-2; *Wanke*, 836 F. Supp. at 599-600.

System argues that the evidence shows that Maine did not act in an obdurate or iniquitous manner and was instead conscientious about the safety of the load, thus precluding punitive damages. System points out several factors to indicate Maine's safe and cautious driving: he drove 1900 miles without incident before the accident; he sped up beyond the 45 mile-per-hour limit in a construction zone only in an attempt to stabilize his load; he conducted a pre-trip inspection of the trailer and the load; he stopped and investigated the trailer when he initially felt the load lean to the right in Moses Lake, Washington; upon arriving at the System Spokane, Washington facility he asked a System mechanic

- 4 -

to inspect the trailer; an Indiana Motor Carrier Enforcement Inspector found that the trailer load was in compliance with DOT regulations; and he tightened the chains and replaced the strap securing the Genie lift in Lake Station, Indiana on August 31 -- one day before the accident. (Sys. Br. at 9-10).

System also points to the fact that Maine initially requested that the lifts be loaded facing each other, but his request was denied. Also, both of Plaintiffs' experts, Nathan Ware and Kenneth Baker, opined that more likely than not, the accident would not have occurred if Genie had specified and loaded the lifts facing each other (basket-to-basket), and would not have occurred if loaded on a stepdeck trailer. System notes that Plaintiffs' experts state that Maine's speed above 45 m.p.h. only contributed to the accident, which was defined by the above-stated conditions. (Id. at 11; Pl. App. Exhs. 12 & 14). In addition, System points out that there is no evidence to show that Maine was impaired in his driving -- for example, he was not intoxicated, he was not on drugs, and he had rested for twenty hours in Indiana shortly before the accident. These facts, System contends, indicate that any fault on System's part only could be attributed to mistaken judgment or human error, which actions do not contemplate a punitive award.

Plaintiffs argue that System failed to paint a complete picture of the relevant facts. Plaintiffs indicate that beyond the

- 5 -

above stated facts, Maine never hauled a Z-60 lift before and that System did not provide Maine with specific directions for Genie lift securement or Genie load tie-down instructions prior to the accident. Plaintiffs emphasize the fact that from the moment Maine left the Genie facility in Moses Lake, Washington, he felt that the load was insecure. Even after Maine and a System mechanic checked the load, he still felt that it was leaning "bad" and was "scary." (Pl. Res. at 3). While still in the Spokane area, Plaintiff alerted his dispatcher of the problem via a text message, who instructed him with urgency to return to System's Spokane yard due to the instability, but he did not and System did not further press the order. Throughout the trip, Maine indicated that he felt "uncomfortable" with the load, experiencing "instability" in left turns, but that he did not notify anyone. Maine's dispatcher Robert DeBolt testified that he may have resolved the situation by phone, but could not recall and there is no other record to indicate any conversation.

The facts do not independently substantiate a punitive damage award. However, the analysis examines the totality of the circumstances. *Wanke*, 836 F. Supp. 604. By itself, the fact that Maine never transported a Z-60 lift before the accident is not enough. At the time of the accident, Maine was an experienced truck driver and in good standing. Further, Maine had a System safety manual, but it is disputed as to whether Maine also had a

copy of recommended Genie tie-down securement instructions at the time of the accident. (System admits in response to Plaintiffs interrogatories that Genie communicated instructions to System regarding the Z-60 lifts and other products (Market App., Exh. 9)). Maine's actual securement method of the lifts, using three binders, three chains, and one strap is undisputed. Genie's tie-down instructions recommended further securement for safe transport. Even if Maine had no knowledge of Genie's specific instructions, outstanding issues remain as to whether the securement loop holes located throughout the lifts were obvious to Maine and whether their use in securement was a necessity for safe transport. Further, Maine's dispatcher at System, Robert DeBolt, stated in his deposition that if he had noticed the lifts only were secured with three chains, he would have resecured the lifts with at least five chains on each lift.

With respect to Maine and System's load stability concerns, even given the facts in the light most favorable to Plaintiffs, there is no evidence to infer that System followed-up to resolve the potentially dangerous situation. Also, although Maine continually checked the securement chains throughout the trip, he never ceased to feel uncomfortable with his leaning load and never wholly rectified the problem. After the initial text message to System, Maine did not mention the leaning load to his supervisors again.

Although it remains a fact issue, Maine's speed in the construction zone, somewhere between 45 and 60 m.p.h., as well as the "dip" in the construction zone and the lane shift, probably contributed to the accident. The speed limit was 45 m.p.h. Speeding alone, however, does not give rise to punitive damages. See Wanke, 836 F. Supp. at 604. System points to Maine's own statements regarding speeding through the construction zone that indicate he was consciously attempting to restabilize the lifts and avoid an accident by pushing on the throttle, which made the load feel more comfortable. (System 56.1 ¶ 41)(Pl. 56.1 Resp. ¶ 41). Plaintiffs contend, however, that slowing down, especially through turns, is intuitive to avoid tipping when transporting a load that has a high center of gravity. (Pl. Res. Br. at 5; see Beckley deposition). Also, Maine stated that throughout the trip the load felt unstable, but that it was more comfortable when slowing down through left turns.

Maine's subjective mental state is at issue. The jury may determine that Maine and System's actions account only for gross misjudgment or human error. However, their actions also indicate a dangerous pattern of warning signs that were apparent and acknowledged by Maine and System, but that were insufficiently attended to or disregarded in order to proceed with the scheduled delivery. Because issues of intent and securement remain, the jury must make those factual determinations at trial. Based on the

evidence, a reasonable jury could find that System and Maine acted with the requisite state of mind to justify a punitive award by clear and convincing evidence. Accordingly, System's motion for partial summary judgment is denied, and the punitive damage claim against System survives for trial.

## B. Genie Industries' Partial Motion for Summary Judgment

Genie filed a motion for partial summary judgment on three issues. First, that strict liability is not applicable under Indiana's product liability statute. Second, that there is no basis for Allen Pierce's emotional distress damages claim. Third, that there is not enough evidence to support a punitive damages claim against Genie. Genie's motion for partial summary judgment is granted.

### 1. Strict Liability Claim

For Plaintiffs to have proper standing to assert their strict liability claim, they must fall within Indiana's statutory guidelines. Indiana's Product Liability Act (the "Act") states that strict liability applies to injured bystander plaintiffs as "consumers" or "users" when they "reasonably . . . expected to be in the vicinity of the product during its reasonably expected use." Ind. Code 34-6-2-29. The critical question in determining whether Plaintiffs fall into the category of persons protected by the Act is the "foreseeability" of the product's expected use and the "forseeability" of the bystander consumer. Gen. Elec. v. Drake,

535 N.E.2d 156, 160 (Ind. Ct. App. 1989)(explaining an earlier version of the Act, but with the same bystander language). Determining the class of persons able to recover under the Act is a legal question and is restricted by these two qualifications. *Stegemoller v. Acands, Inc.*, 767 N.E.2d 974, 975 (Ind. 2002).

Genie argues that the Z-60 lifts were not involved in their "reasonable expected use," and that Plaintiffs were not the intended bystanders under the Act. Genie also argues that Indiana law does not recognize a cause of action for products still within the initial chain of distribution, as the Z-60 lifts were in the middle of transport between Genie's site in Washington and the purchaser in North Carolina. *See Thiele v. Faygo Beverage, Inc.*, 489 N.E.2d 562 (Ind. Ct. App. 1986).

Plaintiffs counter that because there was a sale of the lifts, they were in the stream of commerce during transport and the Act applies. Plaintiffs also contend that transportation is a reasonable expected use of the lifts and that there are no facts that show otherwise. If transporting the lifts falls within their reasonable expected use, then injury to Plaintiffs who were along the route of transport makes them foreseeable bystanders.

The Z-60 lifts generally are used in the construction industry to raise workers up to a specific elevated height. Transportation of the lifts is not a reasonable expected use to trigger bystander liability under the Act. The lifts were in transport to the

consumer so that they could be moved to a location where they actually would be used for either their intended purpose or a reasonably expected purpose. Every product must be transported at some point in time, and to include the Z-60's transport in their "reasonably expected use" would broaden the scope of the Act's coverage too far. Therefore, the Act does not reach this situation. Further, because the first qualification is not met, the bystander foreseeability analysis need not be addressed.

Plaintiffs' cases supporting strict liability do not reach the present situation. *Stegemoller* dealt with the bystander qualification under the Act at 767 N.E.2d at 976. The Indiana Supreme Court specifically "took into account the nature of asbestos products" and the Act's asbestos language in applying it to the claims. The court found that it was foreseeable that an industrial worker's spouse would also have contact with the disease causing asbestos that accumulated on her spouse's work clothes resulting from clean-up activities. *Id.* Similarly, *Butler v. City of Peru*, 733 N.E.2d 912, 919 (Ind. 2000), held that a school was the ultimate user of electricity and therefore a maintenance employee of a "consuming entity," who was injured while trying to restore power to an electrical outlet, falls under the Act. Although the Indiana "supreme court expanded the application of the Act to activities beyond the exact intended purpose of the product [to include] those activities related to furthering the use of the

- 11 -

product," *installation*, *maintenance*, and *repair* all fit into a particular category of activities that "render[] a product operational . . . for its intended purpose." *Vaughn v. Daniels Co., Inc.*, 777 N.E.2d 1110, 1127 (Ind. Ct. App. 2002). The Court finds that transport of the Z-60s does not fit into the same category of related activities. Plaintiffs also do not give any explanation of how transport of the Z-60s fits into the category of specific activities defined by the Indiana courts that render the product operational for its intended purpose.

Due to the disposition of the above issue, the Court need not address Defendant's arguments about the chain of distribution and *Thiele*'s point-of-sale analysis. Accordingly, Genie's Summary Judgment Motion on Plaintiffs' Strict Liability Claim is granted.

## 2. **Allen Pierce's Emotional Damages**

Defendant argues that Allen Pierce (Sr.), does not have an emotional distress damages claim based on his wife Mary Pierce's injuries because she did not sustain severe physical injury. *See Groves v. Taylor*, 729 N.E.2d 569, 572-73 (Ind. 2000). Plaintiffs concede this claim in a footnote attached to their response brief, but only as to any emotional damages suffered by Allen Pierce as a result of Mary Pierce's injuries. Accordingly, the claim is dismissed.

- 12 -

### 3. **Punitive damages against Genie**

Genie argues that "the material facts do not give rise to an inference by which a jury could find that Genie acted with conscious indifference or reckless disregard for the safety of others." (Genie Br. at 6). Genie states that the following facts support its punitive damages argument. It is undisputed that there are no federal regulations or industry customs requiring that Genie learn "the center of gravity and rollover threshold for the tractor-trailer combination." (Genie Br. at 6). Plaintiffs' trucking expert, Donald Asa, admitted that he was not aware of any product shippers (such as Genie), logistics companies, or motor carriers who perform tilt table tests to evaluate load stability prior to transport. (Genie 56.1, Exh. T). Genie argues that even if such testing was done, there is no objective criteria in the industry to evaluate the information.

Genie also argues that Plaintiffs' trucking expert Asa's testimony defeats its claim for punitive damages. First, there is no evidence that using "a flatbed trailer was unreasonably dangerous," to which Plaintiffs' own trucking expert, Asa, agrees. (Genie Br. at 8; 56.1, Exh. T). Genie reiterates this argument with regard to the loading method of the lifts, counterweight-to-counterweight vs. basket-to-basket. Genie states that Plaintiffs' expert Asa conceded that two Z-60s lifts loaded counterweight-to-

- 13 -

counterweight on a flatbed safely could be transported as long as the load is properly secured. (*Id.*).

Genie had been shipping Z-60s on flatbeds since their introduction in 1993. Robert Debolt, System's fleet manager at the time of the accident, testified that it is common to see flatbed trailers used to transport industrial equipment. (Genie 56.1, Exh. O). There is no evidence that Genie's motive in using flatbeds to transport Z-60s was to save money. Genie adds that it also relied on the experience and advice of their logistics provider (Market) and approved carrier (System) with respect to transportation of their product. (Genie Br. at 8). Genie argues that there is absolutely no evidence that they knew their shipping method was unreasonably dangerous. Prior to the present accident, there were no rollover accidents involving Genie Z-60 lifts. Since the lifts' introduction, Genie has transported over 2000 lifts using flatbed trailers throughout the country, and on several of those occasions loading the lifts counterweight-to-counterweight. Finally, Genie argues that it had no control over System and Maine's critical actions, which it alleges caused the accident.

Plaintiffs' argue, however, that a 1998 rollover of a single Genie S-80 lift was a prior similar occurrence, which eventually resulted in the change from flatbed to stepdeck trailer transport. Genie explains that the earlier accident is inapplicable because it involved a truck transporting a different single Genie aerial lift

- 14 -

model.    The driver descended a 6.5 degree incline hill and overheated his brakes, causing the speeding flatbed trailer to leave the roadway and crash.    This does not raise an inference of awareness of a dangerous condition with respect to the Z-60 transport for purposes of punitive damages.

Plaintiffs assert that Genie safety engineer Richard Curtin testified that the lifts posed a risk of injury or death when strapped to a flatbed trailer if they were to rollover in transit. (Pl. Res. at 5; Pl. 56.1 ¶ 44).    Genie engineer Erik Elzinga testified that the engineering department had the capability to determine certain stability characteristics of their lifts when loaded for transport.  (Pl. 56.1 ¶ 131).  The engineers never were approached about the type of trailer or load configuration that should be used in transporting Z-60s.    (Pl. Res. Br. at 5-7). Plaintiffs contend that instead, Genie simply chose to use the less expensive flatbed option and switch the loading method of the lifts due to the concern over chipping the lifts' paint.

Plaintiffs' experts Ware and Baker tested the accident load at the University of Michigan Transportation Institute.    After the tilt-table stability testing, the experts testified that the rollover threshold calculation was at an "unsafe" level when transporting at speeds above 45 m.p.h.  (Pl. Res. 56.1 ¶ 143; Pl. App. 12 & 14).  The experts opined that the accident would not have occurred if there was a stepdeck trailer, and that is more likely

- 15 -

than not that the accident would not have occurred if there was a basket-to-basket configuration. Genie responds that they did not need to consult their engineering department because they reasonably relied on their carrier and logistics experts for those decisions. (Genie Res. to Pl. 56.1 ¶¶ 13-18 (see Meyer and Matushak testimony)).

Plaintiffs also contend that the absence of specific regulations does not prohibit a finding of punitive damages in this case. *See Ford Motor Co. v. Ammerman*, 705 N.E.2d 539, 555-56 (Ind. App. 1999). Plaintiffs argue that Z-60s are distinguishable from standard industrial equipment. They assert that the particular features of aerial lifts give them a higher center of gravity, which can affect the load stability during transport and make them unique loads. Also, Plaintiffs argue that Genie knew of the potentially dangerous nature of transporting the Z-60s because they created specific transportation instructions, yet they failed to communicate that information to either Market or System. (Pl. Res. at 6)(System admits in response to Plaintiffs interrogatories, however, that Genie communicated instructions to System regarding the Z-60 lifts and other Genie products (Market App., Exh. 9)).

Further, Plaintiffs submit testimony from Market's Donald Farthing that discusses a call from Maine to Meyer during transport of the accident load. Genie disputes Farthing's testimony and states that Genie had no knowledge about any problems with the load

- 16 -

at issue after the driver left the Genie facility. (Genie 56.1 ¶ 46, 49-53). This inadmissible double hearsay evidence will not be considered by the Court for purposes of this summary judgment motion.

Plaintiffs do not point to direct evidence, either disputed or undisputed, to show that Genie knew the loading method or use of flatbed trailers was unreasonably dangerous and likely to cause injury. The Court must "look to whether [Plaintiffs] present circumstantial evidence that [Genie] consciously decided to engage in a course of conduct notwithstanding awareness that it would probably expose others to impending danger." *Wanke*, 836 F. Supp. at 601. The Court takes note of the argument that the S-80 lift accident is a different situation and therefore is inadmissible. Even though the accident did involve another Genie aerial lift, it is some evidence of notice with respect to trailer type. *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1269 n.9 (citing *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1083 (5th Cir. 1986)). At trial, Defendants are free to argue the accident's many differences and point out that this S-80 accident is the only one that Plaintiffs point to in the eight-year span that Genie was transporting Z-60s on flatbeds (from 1993 to the 2001 accident).

The Court cannot ignore testimony from Plaintiffs' own expert, Donald Asa, that transporting the lifts on a flatbed trailer and loading the lifts counterweight-to-counterweight were not unsafe

- 17 -

methods of transport. (Genie 56.1, Exh. T). Even so, the Court notes the existence of somewhat conflicting opinion testimony from Plaintiffs' other experts, Ware and Baker, regarding the accident load's "unsafe" rollover threshold level at speeds above 45 m.p.h. However, there has been no evidence presented that other industrial manufacturers, logistics companies, or carriers do any load stability testing (or are required to do testing) before transport. There also is no evidence that Genie received complaints concerning the load stability, either internally (as Ford did in *Ammerman*) or externally from the drivers (as with the S-80s), before the tragic Pierce accident. These facts do not shield Genie from a finding of liability under a negligence standard, but they cut against punitive damages.

Richard Curtin's statement, even when construed in the light most favorable to Plaintiffs, is merely evidence that a large industrial transport is potentially dangerous and appropriate care should be taken. *See Juarez v. Menard, Inc.*, 366 F.3d 479, 482 (7th Cir. 2004) ("It is not enough that the tortfeasor engage in conduct that she knows will probably result in injury. After all, most business owners understand that their operations pose some level of risk of injury to consumers."). Genie also attacks Plaintiffs attempts to distinguish the Z-60s from other industrial equipment -- Bruce Leonard from Market stated that the aerial lifts were not considered a "unique shipment load" from other industrial

equipment and DeBolt testified that industrial equipment is commonly transported on flatbed trailers. The Z-60s were shipped on flatbeds since their inception. There is no evidence to indicate that at anytime between 1993 and 2001 Genie knew internally or was informed from an outside source that using a flatbed was a dangerous form of shipment for these lifts, but still continued to ship in that manner. *See Samuel v. Home Run, Inc.*, 784 F. Supp. 548, 551-52 (S.D. Ind. 1992)("Merely creating a dangerous situation does not support a further inference that the conduct was wanton or morally blameworthy").

Plaintiffs bear the burden of proof at trial, and because the available evidence is all circumstantial, proving punitive damages by a clear and convincing standard is difficult. *See Orkin Exterminating Co., Inc. v. Traina*, 486 N.E.2d 1019, 1023 (Ind. 1986)(finding the evidence to support punitive damages "woefully lacking"). For purposes of finding the requisite state of mind to justify punitive damages, Plaintiffs point to no evidence that Genie knew its methods in transporting the Z-60s would cause injury. *See Juarez*, 366 F.3d at 483 (finding that several accidents only were circumstantial evidence and not enough to justify "quasicriminal conduct that Indiana courts require before awarding punitive damages"). Additionally, although Genie did not consult its engineers regarding the Z-60 transport, Plaintiffs do not present any evidence to indicate that Genie was consciously

- 19 -

avoiding testing required of it by regulations or other standards, common or even existent in industry practice, or apparent need because of safety concerns over safe transport of the Z-60. *Cf. Ammerman*, 705 N.E.2d 539, 555-57 (Ind. App. 1999)(finding punitive damages where defendant Ford had conducted several conclusive tests regarding instability of the product, knew of the defect, was under investigation by regulators, but continued production as the status quo despite internal protest). Further, Plaintiffs' argument concerning the quality of Genie's communication of its recommended securement instructions to System fails to raise a sufficient favorable inference for purposes of punitive damages because federal regulations make securement the carrier's primary responsibility (*see* 49 C.F.R. §§ 390-393), System received some type of recommended instruction from Genie, and proper securement is necessary for safe transport of all products.

Even affording all inferences in the light most favorable to Plaintiffs, there is no evidence that Genie "knew of, but consciously disregarded the likely injurious consequences of their course of conduct." *Purnick*, 269 F.3d 851, 853-54 (citing *Wanke*, 836 F. Supp. at 600)(affirming the district court's grant of summary judgment because of insufficient evidence on punitive damages). The Court concludes that no reasonable jury could impose punitive damages under Indiana's clear and convincing standard. Accordingly, Genie's Motion is granted on this ground.

## C. **Market's Motion for Summary Judgment**

Market's summary judgment motion rests on three theories to fully absolve it of liability and contests the punitive damages claim. First, Market's role as an independent contractor ("IC") between Genie and System absolve it from any liability involving the accident. Second, System and Maine are solely responsible for the safe transport of the load pursuant to the federal regulations. Third, Maine's intervening negligent actions preclude any liability directed at Market. The Court finds that Market is not off-the-hook with respect to its own potential negligence, but that the punitive damages claim against Market is unwarranted and hereby dismissed.

### 1. *Market's Independent Contractor Role*

Market argues that it is a transportation broker and logistics company and that its role as an IC at the time of the accident was to offer administrative support, logistical experience, and to assist in arranging for transportation of Genie products by tendering Genie loads to qualified motor carriers. (Market Br. at 2). Market states that in its role, it made only commercial arrangements for the shipper, as specified in the Logistics Management Agreement (the "LM Agreement") between Genie and Market, which absolves it from any liability relating to the accident. (Market 56.1, Exh. 6). Market contends that Genie had been using System as a contract carrier since 1998. In 2001 Tim Meyer,

Genie's Traffic Manager, used System to transport the two Z-60 lifts involved in the accident. Genie employees loaded the subject lifts onto the trailer and a System driver, Maine, accepted the load. Market asserts that it has nothing to do with any negligence or other issues of improper securement or loading of the lifts. Market does not point to Indiana law, but cites to three cases to support its theory that it cannot be liable because of its contractual IC status. The cases discuss the IC broker-carrier relationship and when the relationship could potentially transform into one of principal-agent resulting in vicarious liability, which would make the broker liable for the driver's negligent actions. *Schramm v. Foster*, No. Civ. JFM-02-3442, 2004 WL 1882629 (D. Md. Aug. 24, 2004); *Toledo v. Van Waters & Rogers, Inc.*, 92 F. Supp. 2d 44 (D.R.I. 2000); *Tartaglione v. Shaw's Express, Inc.*, 790 F. Supp. 438 (D.S.D. 1992).

Plaintiffs argue that all of Market's cases are distinguishable because Plaintiffs' claims are for independent acts of Market's own negligence, which contributed to the accident. Plaintiffs contend Tim Meyer testified that when he was a Market employee in 1998 or 1999, in performing his contractual duties to Genie, he requested that the Z-60 lifts be transported by flatbed trailers and loaded counterweight-to-counterweight, rather than basket-to-basket. Plaintiffs' experts Ware and Baker also opine that the counterweight loading method of the subject lifts and the

- 22 -

use of a flatbed may be primary causes of the accident. (Pl. Resp. at 4). "Market's participation in tendering Z-60's to its contract carriers [using such loading method] was negligent. . . ." (*Id.* at 4). Plaintiffs also point to testimony by Genie employees, Meyer and Matushak, that Genie expected Market, as a logistics transportation expert, to make those decisions. (Genie Resp. Pl. 56.1 ¶¶ 13-18; Genie 56.1, Exh. K). Similar to Genie, Market never conducted stability or safety tests concerning the transportation method.

The Court has reviewed the LM Agreement between Market and Genie and finds that although in the LM Agreement Market is designated as an IC, that status does not shield Market from its own potential acts of negligence. However, the plain language of the LM Agreement specifically precludes Market from any vicarious liability claims involving Genie or System regardless of its designation as a "shipper's agent," and includes other liability limiting provisions that are not directly on point. The same is true of the contract between System and Market. The Court also concludes that the facts asserted regarding the interaction between Genie and Market in Plaintiffs' additional 56.1 statement are not sufficient to give rise to a principal-agent relationship based on conduct. (*See* Pl. 56.1 ¶¶ 20-35); *see Schramm*, 341 F. Supp. 2d at 543-45. Therefore, Market is not vicariously liable for Genie's or System's independent actions.

Beyond any vicarious liability claims, Market's argument essentially focuses on the issue of duty and whether Market actually had a duty to Plaintiffs in order for Plaintiffs to move forward on their negligence claims. Under Indiana law, the court considers three things in determining whether a duty exists: "(1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns." Williams v. R.H. Marlin, Inc., 656 N.E.2d 1145, 1155 (Ind. Ct. App. 1995). The central question at issue here is the "relationship of the parties" inquiry, which can arise through contract or conduct.

To interpret a written contract, the court must "ascertain the intent of the parties at the time the contract was executed as disclosed by the language used to express their rights and duties." Merril v. Knauf Fiber Glass, 771 N.E.2d 1258, 1268 (Ind. Ct. App. 2002). Contract interpretation is ordinarily a question of law. Ind. Broadcasting Corp. v. Star Stations of Ind., 388 N.E.2d 568, 571-72 (Ind. Ct. App. 1979). However, if the court finds that the relevant provisions in the contract are ambiguous or uncertain, determining the extrinsic evidence then becomes a question of fact for the jury. Id.

The LM Agreement states that Market is in the business of "providing integrated logistics management services, including arranging for and furnishing transportation. . . ." (Market 56.1

App., Exh. 6). The contract does not explicitly include Market's alleged negligent actions, nor does it explicitly exclude those actions. The "Scope of Services" section of the LM Agreement uses general terms to describe "transportation services" such as "coordinating transportation" and "other services requested by customer." (Id.) In the "transportation coordination" section, the contract references particular types of coordination tasks, but specifically states that "coordination may include, but is not limited to . . . " (Id.) None of the other provisions in the contract make the scope of services more definitive.

There is a degree of uncertainty in the contract over the particular scope of services that Market will agree to perform for Genie. To determine if advising Genie on the carrier trailer type and loading method were logistics services included within the scope of the contract, "the responsibility [is placed] on the trier of fact to ascertain the extrinsic facts necessary to interpret the contract." *Kordick v. Merchants Nat'l Bank & Trust Co. of Indianapolis*, 496 N.E.2d 119, 125 (Ind. Ct. App. 1986). The jury first must resolve whether these types of services were contemplated within the scope of Genie and Market's LM agreement and then determine whether Genie requested these services of Market.

A duty of care may also arise through conduct. When a party voluntarily assumes a duty, that party "creates a special

- 25 -

relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person." *Delta Tau Delta v. Johnson*, 712 N.E.2d 968, 975 (Ind. 1999). The existence and extent of such a duty are ordinarily questions of fact for the trier of fact. *Id.* The jury must determine whether Market's conduct involved in transporting Genie's Z-60s lifts and tendering such loads to System establishes a duty of care where potentially it could be liable to a "reasonably foreseeable victim [who was] injured by a reasonably foreseeable harm." *Williams*, 656 N.E.2d at 1155.

The issue of Market's own negligence through an assumed duty by contract or conduct, remains a fact determination for the jury. The jury also must resolve which Defendants actually engaged in the allegedly negligent conduct to allocate responsibility for the accident. However, Market cannot be held vicariously liable for any of Genie or System's negligent actions. Accordingly, Market's Summary Judgment Motion on this ground is denied.

## 2. **Federal Regulation Violations and Market's Liability**

Market also argues that System's failure to properly secure the Z-60 lifts violated the applicable federal regulations as to carriers and thus precludes any liability on Market's part. Market points to sections of the Federal Motor Carrier Safety Regulations that require the driver to properly distribute and secure a load on

his trailer before driving, and also inspect the securement devices during transport. 49 C.F.R. §§ 390-393.

In support of its argument, Market cites to a recent district of Minnesota case. *Smith v. N. Dewatering, Inc.*, No. Civ. 01-1948, 2004 WL 326696, at *2-3 (D. Minn. Feb. 19, 2004). In *Smith*, the plaintiff truck driver was injured while unloading pipes from his trailer. The defendant brought a third-party action against the shipper of the pipes for improperly loading them on the trailer by not adding securement stakes between the pipes. The court granted summary judgment in favor of the shipper, who was released from liability. Market contends that because Maine accepted the load, the federal regulations shift the liability burden to the carrier. *See id.*

Plaintiffs argue that *Smith*'s facts are distinguishable. The *Smith* court also recognized the possibility of a co-existing common-law duty if the loading had a latent defect or the loader provided the carrier with assurances that it was properly loaded. *See id.* (citing *United States v. Savage Truck Line, Inc.*, 209 F.2d 442 (4th Cir. 1953)). In *Smith*, the driver transported the shipper's pipes many times over the course of several years and was familiar with the accident load. Also, the driver never expressed any concerns with the shipper over the pipes' securement.

Here, Plaintiffs contend, when Maine picked up the Z-60s, Genie loaded the trailer and would not alter their loading practice

- 27 -

even upon Maine's request. System did not orchestrate the loading method and there is conflicting evidence over who designated the Z-60 lifts loading configuration -- Market or Genie. Further, there is a dispute over whether the loading configuration was reasonably safe or actually unsafe. Thus, the potential of a latent defect still exists that could give rise to liability. *See United States v. Diebold, Inc.*, 369 U.S. 654, 82 S. Ct. 993 (1962)(stating that inferences drawn from underlying facts should be made in favor of the party opposing summary judgment).

Neither party points to any Seventh Circuit appellate nor district court case law on this issue, but after examining applicable federal regulations, the Court will follow the general carrier-shipper rule set out in *United States v. Savage Truck Line, Inc.*, 209 F.2d 442, 445 (4th Cir. 1953). The primary duty for safe loading rests with the carrier. *Id.; see also* 40 C.F.R. § 392.9. When the shipper assumes responsibility for loading, the shipper becomes liable for latent defects in improper loading, or for assuring the carrier that a certain loading method is safe and standard after which the carrier then relies on such assurances. *See Savage*, 209 F.2d at 445. "Although a carrier may be liable to the general public for damages caused by failure to comply with the Commissions's rules, its duty with regard to a shipper, who has assumed the responsibility for the load is to exercise reasonable care to see that the load is properly secured." *Franklin Stainless*

Corp. v. Marlo Transp. Corp., 748 F.2d 865, 868-69 (4th Cir. 1984) (citing Am. Foreign Ins. Ass'n v. Seatrain Lines, Inc., 689 F.2d 295, 299-300 (1st Cir. 1982))(jury finding that "improper loading and consequent shift of the cargo was a proximate cause of the accident"). In a case similar to this one, the court held that whether a carrier acted reasonably in accepting the shipper's mistaken assurances that the height of cargo loaded by the shipper was not excessive presented a question of fact for the jury, precluding the shipper's summary judgment motion. Ebasco Serv., Inc. v. Pacific Intermountain Express Co., 398 F. Supp. 565 (S.D.N.Y. 1975).

The undisputed facts are as follows. Although Maine had extensive experience in the trucking industry, he had no experience with the particular Z-60 lifts before the accident transport. It is also undisputed that at the Genie facility, Genie employees assumed the responsibility of loading the lifts. During loading, Maine inquired into the counterweight method, but Genie did not alter their load configuration, which was the standard manner that they had been loading Z-60s for some time. See Franklin, 748 F.2d at 868-70 (holding even though lack of strapping was apparent to driver, defect not obvious when carrier had never transported that type of cargo and relied on shipper's assurances that cargo was secure).

- 29 -

Material issues of fact remain, which bear on the ultimate issue of allocation of liability between the defendants. These include, the overall load safety and actual existence of a defect in the configuration, and the loading responsibility between Genie and Market. The disputed facts alone preclude summary judgment. The facts also are sufficient to raise the inference that Maine's lack of knowledge about a defect in loading the lifts and his reasonable reliance on Genie's assurances preclude System as the carrier from bearing responsibility for the loading method. The Court notes that these carrier-shipper cases deal with contribution claims and are third-party actions. *See, e.g.*, *Smith*, 2004 WL 326696, at *2-3; *Alitalia v. Arrow Trucking Co.*, 977 F. Supp. 973, 984 (D. Ariz. 1997); *Franklin*, 748 F.2d at 868-70. Plaintiffs underlying claims of negligence involving all three defendants still await resolution. (As an example, beyond the specific loading method, Plaintiffs claim the use of flatbed over stepdeck trailers was a cause of the accident, and issues remain as to the propriety of such choice and which defendant bears that responsibility.) Accordingly, Market's motion on this ground is denied.

### 3. Maine's Intervening Actions

Market argues that Maine's superseding acts were the proximate cause of the accident. Market contends that System's intervening negligent conduct precludes any finding of liability on Market's

part. However, outstanding factual issues remain over the proximate cause of the accident and the extent of each defendant's contributory negligent actions. Under Indiana law, the doctrine of intervening cause provides that only when "a negligent act or omission is followed by a subsequent negligent act or omission so remote in time that it breaks the chain of causation, the original wrongdoer is relieved of liability." *Control Techniques, Inc. v. Johnson*, 762 N.E.2d 104, 107 (Ind. 2002). The issue is whether Plaintiffs' injuries are "a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated." *Bader v. Johnson*, 732 N.E.2d 1212, 1218 (Ind. 2000).

Market also asserts that Maine's alleged negligent actions -- failure to properly secure the load, continuing unstable transport, and speeding -- were unforeseeable, which Plaintiffs dispute. *See Vernon v. Kroger Co.*, 712 N.E.2d 976 (Ind. 1999). "Whether the resulting harm is 'foreseeable' such that liability may be imposed on the original wrongdoer is a question of fact for a jury." *Control Techniques*, 762 N.E.2d at 107. Accordingly, factual questions remain on the critical causation issue of foreseeability of Plaintiffs' injuries, which encompasses Maine's actions and the Court denies Market's summary judgment motion on this ground.

## 4. **Punitive Damages Against Market**

A punitive damages claim involves a fact intensive inquiry into the actor's wanton conduct that must be proved by clear and

- 31 -

convincing evidence. *See supra* Section III.A. Several issues of fact remain, including determining whether Market had a duty to Plaintiffs and Market's actual conduct. However, Market's and Genie's potential negligent conduct and responsibility somewhat overlap for purposes of punitive damages. Further, Market is a bit more removed than either the carrier System or the manufacturer Genie as it is a third-party logistics intermediary. Therefore, the Court dismisses the punitive damages claim against Market.

## IV. CONCLUSION

For the reasons stated above, the Court rules as follows:

1.  System's Partial Motion for Summary Judgment is denied.

2.  Genie's Motion is granted with respect to strict liability, Allen Pierce's emotional distress claim, and the punitive damages claim.

3.  Market's Motion is granted with respect to the punitive damages claim, and denied on all other grounds.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: _May 17, 2005_

- 32 -